IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AARON MORGAN and ABBEY MORGAN, Individually and as the Next Friends of A.R.M., a minor, | ) ) ) ) ) | CASE NO.: _____ |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **COMPLAINT** |
| GRACO CHILDREN'S PRODUCTS, INC. a foreign corporation Corporation Service Company 2 Sun Court, Suite 400 Peachtree Corners, GA  30092 | ) ) ) ) ) ) ) | **and JURY DEMAND** |
| and | ) ) | |
| FORD MOTOR COMPANY, INC., a foreign corporation CT Corporation System 5601 South 59th Street Lincoln, NE  68516 | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' COMPLAINT**

For their claims and causes of action against the defendants, plaintiffs Aaron and Abbey Morgan, individually and as the natural parents and Next Friends of A.R.M., a minor, state and allege as follows.

**Facts Surrounding the Wreck**

1.      On November 9, 2021, Abbey Morgan was driving the
Explorer in Norfolk, Nebraska, traveling eastbound on Eisenhower
Avenue. Her three minor children were passengers in the vehicle.
A.R.M. was properly restrained in a Graco 4EverDLX child restraint
(the subject child restraint) that was installed in the third-row seat on
the driver's side using the Explorer's 3-point seat belts. L.E.M. (DOB
2020) was properly restrained in a Graco 4Ever child restraint that
was installed in the third-row seat on the passenger side using the
LATCH connections. A.A.M. (DOB 2021) was properly restrained in a
Graco infant child restraint that was installed in the second-row seat
on the passenger side using the LATCH connections. All three children
were properly restrained in Graco child restraints that were, in turn,
each properly installed in the Explorer, according to Graco's directions
and instructions.

2.      While Abbey was proceeding through the intersection of
Eisenhower Avenue and Highway 81, with a green traffic signal, a
Dodge pickup truck driven by Joel Stenberg ran a red light and struck
the Explorer on the passenger side.

3.      A.A.M., seated on the passenger/struck side of the
Explorer, spent less than an hour in the hospital. She received no
physical injuries in the crash.

4.      L.E.M., also on the passenger/struck side of the Explorer,
sustained a small, superficial abrasion to his right cheek. This was his
only physical injury. He spent around an hour in the hospital.

5.      A.R.M., despite being on the far side of the Explorer – the
child furthest from the impact – received head and spinal cord injuries
that resulted in ventilator dependent quadriplegia.

**Jurisdiction and Venue**

6.      At all relevant times, Aaron and Abbey Morgan were
married and lived in Nebraska, residing in the City of Wausa, County
of Knox. A.R.M. is the natural child of Aaron and Abbey, was born in
2019, and is an unmarried minor.  A.R.M. resides with Abbey, Aaron,
and her siblings in Wausa, Nebraska.  Aaron and Abbey are bringing

this action as Next Friends of A.R.M. on her behalf pursuant to Neb. Rev. Stat. § 25-307.

7.      Defendant Graco Children's Products, Inc. (Graco) was, at all relevant times, a foreign corporation organized and existing according to the laws of the State of Pennsylvania and is headquartered in Georgia. Graco was not and is not registered as a foreign corporation in Nebraska but it did, at all relevant times, engage in the business of designing, manufacturing, distributing, marketing, and selling child restraint systems (child seats) for use by consumers in the State of Nebraska. Graco has committed tortious acts in the State of Nebraska in that it designed, tested, manufactured, distributed, marketed, labeled, advertised, and sold the subject child restraint to the Morgans with an accompanying manual known as the 4EverDLX, Model 2074607 with a manufacturing date of October 28, 2020.

8.      Defendant Ford Motor Company, Inc. (Ford) was, at all relevant times, a foreign corporation organized and existing according to the laws of the State of Delaware and is headquartered in Michigan. At all relevant times, Ford was and is registered in Nebraska as a foreign corporation and has conducted business in the State of Nebraska. Ford is and has been engaged in the business of designing, assembling, manufacturing, distributing, marketing, and selling motor vehicles in the State of Nebraska. Ford has committed tortious acts in the State of Nebraska in that it designed, tested, assembled, distributed, marketed, advertised, and sold a certain 2014 Ford Explorer, VIN 1FM5K8D89EGA17419 for ultimate distribution, sale, and use in the State of Nebraska. Ford is subject to the Court's jurisdiction for, among others, the following reasons:

a.   It knowingly, intentionally, and deliberately placed the Explorer into the stream of commerce under circumstances such that Ford should reasonably anticipate being haled into court in Nebraska to answer claims about the failure of its product in Nebraska.

b.   Ford places its products into the stream of commerce by

3

targeting Nebraska consumers through dozens of approved Ford dealerships in the State and as occurred here, in very near proximity to the State.

c. Ford has contracts with dozens of dealerships in Nebraska in which it contractually promises to come into the courts of Nebraska to defend claims involving the failure of its products in Nebraska.

d. Ford has been a party in many cases where it has come into the courts of Nebraska, without claiming a lack of jurisdiction, to answer claims about the failures of its products in Nebraska.

e. Ford has been a party seeking relief or review in many cases where it has purposefully availed itself of the jurisdiction of Nebraska courts by serving as the plaintiff, petitioner, appellant, or removing party in such cases.

f. Ford's wholly owned and fully controlled subsidiary, Ford Motor Credit, consistently and regularly makes use of the Nebraska courts to sue Nebraska residents.

g. Ford voluntarily chose to sell its products new and in used condition to be resold from dealer to dealer, transferred from hand to hand and from state to state.

h. Ford has a regular plan for the distribution of its products in Nebraska to achieve a commercial benefit from the sale of products in Nebraska.

i. Ford engages in national marketing of its products that intentionally pervade into the Nebraska market.

j. Ford targets marketing specific to Nebraska.

k. Ford's contracts with Nebraska dealerships require those dealerships to advertise in Nebraska, and Ford shares in the cost of these Nebraska advertisements for its products.

l. Ford jointly participates in the interactive websites of dozens of Ford dealerships located in Nebraska.

m.  Ford certifies mechanics who work at Ford dealerships in
    Nebraska; these mechanics worked on the Explorer in at
    least two different authorized Ford dealerships in
    Nebraska.

n.  Ford provides certification training for mechanics who
    work at Ford dealerships at locations throughout
    Nebraska; these mechanics worked on the Explorer in at
    least two different authorized Ford dealerships in
    Nebraska.

o.  Ford oversees aspects of its product warranty process
    from within Nebraska.

p.  Ford sends technical service bulletins regarding work
    procedures related to its products into Nebraska.

q.  Ford issues Manufacturer Customer Satisfaction Program
    bulletins in Nebraska and did so here with respect to the
    Explorer.

r.  Ford sends recall notices related to safety defects into
    Nebraska and did so here with respect to the Explorer.

s.  Ford directs Nebraska customers to approved Ford service
    centers in Nebraska for recall work even when vehicles
    needing such work were originally sold to buyers in states
    other than Nebraska; it did so here with respect to the
    Explorer.

t.  Ford gathers data about the performance of its vehicles in
    Nebraska and uses that data in the redesign of its
    products.

u.  Ford's Critical Concern Review Group determines
    whether or not design and manufacturing issues raise
    safety concerns based, in large part, on its Global
    Common Quality Indicatory System database of
    information gathered from dealerships, including dozens
    of dealerships in Nebraska, and it uses this data to
    redesign its products sold in Nebraska.

v.  Ford redesigns its products sold in Nebraska and elsewhere based in part on data generated by its dozens of dealerships in Nebraska through the Master Owner Relation System and Customer Data Link.

w.  Ford has an active website accessible in Nebraska where it engages in the direct sale of Ford parts and components.

x.  Ford's active website has numerous interactive features with which Nebraska consumers can exchange information to apply for credit to finance the purchase of a Ford product, can exchange information to make on-line payments for Ford products, can exchange information to request a quote from a Nebraska dealership, can exchange information to obtain discounts on Ford products purchased in Nebraska, can exchange information to build a Ford with or without various options, can build a product on-line and get a price quote, can exchange information to get an estimated valuation for a trade-in vehicle, can exchange information to search the new and used vehicle inventory of Nebraska Ford dealerships, and can exchange information to obtain the location of Nebraska dealerships and how to get to them from starting points both within and outside of Nebraska.

y.  Ford is registered to do business in Nebraska and has a registered agent in Nebraska.

z.  Ford has tens of thousands of customers in Nebraska.

aa. Ford derives millions of dollars a year in revenues from sales of products in Nebraska.

bb. Ford spends substantial sums annually marketing its products in Nebraska.

cc. Ford holds patents and trademarks which it demands must be honored in Nebraska.

dd. Ford has purposefully availed itself of the privilege and benefits of conducting business in Nebraska.

9.    The Explorer was assembled by Ford in Illinois.

10.    Ford's acts with respect to the Explorer caused injury within Nebraska.

11.    The claims in this action are connected with and/or relate to Ford's extensive contacts with Nebraska.

12.    Jurisdiction is proper in the District of Nebraska, as subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs.

13.    Venue is proper in the District of Nebraska, Omaha Division, as this action arises out of an incident that occurred in Norfolk, Madison County, Nebraska.

14.    Defendants Ford and Graco are jointly and severally liable for the damages alleged and set forth below.

## Facts Specific To Graco

15.    The subject child restraint was, according to its label, manufactured on October 29, 2020.

16.    The subject child restraint was sold to plaintiffs on January 10, 2021.

17.    At the time the subject child restraint was sold, Graco was "*proud of the fact and has said that Graco is highly trusted. It's one of the most trusted names in the child restraint industry*."

18.    At the time the subject child restraint was sold, Graco believed, understood, and knew that "*the caregivers, the parents who buy Graco child restraints, are entitled to trust in and rely on what Graco tells them in their manuals*."

19.    At the time the subject child restraint was sold, Graco wanted parents to "*trust in and rely on*" what it told them.

20.    At the time the subject child restraint was sold, Graco believed, understood, and knew that "*parents (were) entitled to trust in and rely on Graco to be truthful and honest with them about Graco's child restraints*."

21.    At the time the subject child restraint was sold, Graco believed, understood, and knew that it "*should be honest and tell its consumers the truth 100% of the time.*"

22.    At the time the subject child restraint was sold, Graco believed, understood, and knew that it "*would never fault a mom or dad for trusting in Graco.*"

23.    At the time the subject child restraint was sold, Graco believed, understood, and knew that "*well-intentioned parents, well-meaning parents who are obviously concerned about their children are (often) confused about some of the usage requirements, the selection, the installation process.*"

24.    At the time the subject child restraint was sold, Graco believed, understood, and knew that "*the more you can educate (a parent), the better choice they are going to make.*"

25.    At the time the subject child restraint was sold, Graco believed, understood, and knew that a "best practice" related to child seat installation was the "*gold standard in safe transportation of kids.*"

26.    At the time the subject child restraint was sold, Graco believed, understood, and knew that (i) giving parents the "best practice" recommendations and why they are important give parents the "*complete picture,*" a "*full picture,*" and, (ii) that parents cannot make an intelligent choice until that have the full picture, "*they have to have the full picture.*"

27.    The instruction manual that Graco supplied with the subject child restraint identified it as part number NWL0000814217C. It was approved and published by Graco on "10/18."

28.    Graco knew that parents and consumers like Abbey and Aaron would, and it believed they should, rely on the information set forth in the instruction manual that came with the subject child restraint. In fact, Graco told parents not to install or use the child restraint until they had read the manual.

29.    Graco intended the subject child restraint to be installed in vehicles using either the seat belts or what is known as the LATCH

connections. "LATCH" is an acronym for "Lower Anchors and Tethers for Children."

30.     In a section of the manual that came with the subject child restraint, entitled "*What is LATCH?*," Graco said: "*LATCH consists of lower anchors and top tether anchors, which are built-in to your vehicle, and connecting hooks that are built-in to your car seat.*"

31.     Knowing, understanding, and believing that Abbey and Aaron would trust and rely on Graco to tell them which method they should use to install the subject child restraint in the Explorer, that it would be truthful and honest with them, and that it would give them the "full picture" to help them make decisions with knowledge of "best practices," Graco included a section in the manual that came with the subject child restraint entitled "*Which Installation Method Should I Use?*" In that section of the manual, Graco told Abbey and Aaron that the subject child restraint could "*be installed in your vehicle using either the vehicle seat belt OR the LATCH system.*" (emphasis in original). In the next sentence, Graco promised, represented, and assured parents and consumers, including Abbey and Aaron, that "*[b]oth are equally safe to use.*"  An excerpt from the manual provided to the Morgans is below.



**Which Installation Method Should I Use?**

This car seat can be installed in your vehicle using either the vehicle seat belt **OR** the LATCH system. Both are equally safe to use. DO NOT USE BOTH AT THE SAME TIME IN THE 5-POINT HARNESS MODE. Graco allows the securing of the car seat with LATCH system in the booster mode, only if the vehicle manufacture allows it.

32.     Abbey and Aaron read the manual supplied to them by Graco. They trusted that what Graco told them about installing the subject child restraint was true. They trusted the Graco name and had trusted it for years. They relied on Graco to properly instruct them on how to use the subject child restraint. They relied on Graco to be truthful and honest with them. They relied on Graco to give them the

full picture on what it knew and how to use the seat to best protect their children.

33.     Graco's representation that "*both are equally safe to use*" was false as it pertained to Abbey and Aaron's use of the subject child restraint in the Explorer. This was a misrepresentation. It was materially misleading. It was recklessly made. It was negligently provided. It concealed the truth from Abbey and Aaron about testing that was and was not done with the 4EverDLX platform and, with respect to testing that was done, the results of those tests. It was completely contrary to best practices, which Graco had written, approved, ratified, and agreed.

34.     What did Graco know that was directly contrary to the "*both are equally safe to use*" promise? What did Graco hide and conceal from Abbey and Aaron? *A lot.* Before the sale of the subject child restraint, for example:

    a.  Graco knew that, as early as 1992 – reaffirmed in 1997 and 2012 – the Society of Automotive Engineers had published SAE J1369 regarding the use of tether straps with child restraints, which stated that a tether "*contributes considerably to the stability and effectiveness of these child restraint systems particularly in frontal and side impacts.*"

    b.  Graco agreed with, approved, and signed off on proposals relating to tether use made in 1996 as part of the Blue Ribbon Panel on Child Restraint and Vehicle Compatibility where the following was stated:

        i.   "*Test results clearly demonstrate that a fastened tether can significantly reduce dummy head excursion measurements which most developers and evaluators use as the primary predictor of a CRS's performance in field accidents.*"

        ii.  "*An Australian report cites forward-facing CRS test results, indicating that as well as reducing head excursion, a top tether . . . significantly*

*reduces head acceleration and neck loads in frontal impacts.*"

c. Graco agreed with, approved, and signed off on several editions of the LATCH Manual, beginning in 2003, where, in one or more editions, the following was stated:

    i. "*With or without lower LATCH anchors, tethers improve the protection for the child.*"

    ii. "*A top tether reduces forward motion of the child restraint in a severe crash, reducing the risk of injury to the child.*"

    iii. "*A tether, when used correctly, can greatly improve crash performance of a child restraint, whether used with lower LATCH anchors or with a seat belt.*"

    iv. "*A tether is particularly helpful in cases where . . . the rear seats have limited space for forward motion in a crash . . . .*"

    v. "*Best practice is to **always** use a tether if it is available for a forward-facing CR, because less head excursion means less risk of injury*" (emphasis in original).

    vi. "*Always use a top tether when installing a forward-facing restraint with . . . seat belts.*"

    vii. "*With or without lower anchors, a top tether improves the protection for the child in a forward-facing CR. . . . This is especially important in vehicles with reduced rear occupant space . . . .*"

    viii. "***A tethered restraint allows less head movement** in a head-on or front-angle crash compared to a non-tethered CR, greatly reducing the likelihood of head injury due to contacting the vehicle interior or neck injury occurring.*"  (Emphasis in original)

11

ix. "*A tether strap is known to improve performance of a forward-facing restraint with either lower attachments or a safety belt in use. This feature of LATCH has the most possibility of actually saving lives – if it is used.*"

x. "*Use of a tether for a forward-facing child restraint is very beneficial.*"

xi. "*The tether provides enhanced protection for a forward-facing child restraint.*"

xii. "*A tether can make an appreciable difference in head movement in a crash and thus in injury prevention, so encouraging tether use should be a high priority for those involved in childhood injury prevention.*"

xiii. "*Testing and crash experience over many years . . . have shown the benefits of tethers. Tethers reduce not only head excursion but also head acceleration and neck loading . . . . Real word experience with tethers in Australia shows that serious neck injuries with correctly installed tethers are virtually non-existent.*"

xiv. "*A tether dramatically improves performance even if the lower anchors are loose.*"

xv. "***Tether use improves safety***." (Emphasis in original)

xvi. "***Studies confirm benefits of tethers***." (Emphasis in original)

xvii. "*Tethers reduce not only head movement (excursion) but also head acceleration and neck loading.*"

xviii. "*The fact that tethers are unregulated in the U.S. may contribute to less emphasis being placed on their use than is deserved. Evidence of the safety benefits of tethers for children riding in FF CRs is*

*conclusive, so they should be used whenever possible."*

xix. *"Why tethers are vitally important . . . . Whether using lower anchors or the seat belt for installation, a tether greatly improves the protection for a child in a forward-facing CR. It serves as a third point of anchorage at the top of the CR, limiting forward motion (excursion) of the child's head . . . . This is especially important in vehicles with small rear seating areas. . . ."*

xx. A tether is *a very protective feature."*

xxi. *"Even when not required, a tether improves performance of any forward-facing CR."*

xxii. *"All evidence indicates that a properly used tether on a forward-facing CR can greatly reduce forward head excursion in a crash and thereby decrease the likelihood of injury. That means that tether use should be encouraged whenever possible . . . ."*

xxiii. *"It is clear that anchoring the top of a forward-facing child restraint with a tether strap increases the protection that a CR provides from possible injury in a crash."*

xxiv. *"A tether is better! [ ] Adding a tether is one of the best things to do to enhance the safety for a forward-facing child."*

xxv. *"Strongly advise use of the tether for improved protection, even if the installation already seems secure and even if a seat belt is used for installation."*

xxvi. *"Communicating the safety benefit of tethering is very important."*

xxvii. *"Too often, users say they don't understand why they should use a tether . . . . One problem is that*

*the benefits are not emphasized enough in CR . . . manuals . . . ."*

xxviii.   "*Securing the top of CR with a tether is the most direct and effective method for accomplishing the goal of preventing serious injury in a crash by limiting head excursion.*"

xxix.   "*Best practice recommendation . . . Use the tether whenever possible to limit head movement and reduce the risk of head or neck injury.*"

xxx.   "*When forward-facing, tether use recommended at all usage weights.*"

xxxi.   "**We call for a more concerted effort nationwide to promote the awareness and use of tethers**." (Emphasis in original)

xxxii.   "**Best practice for tether use**. *For a forward-facing CR, use of a tight tether is recommended whenever possible.*" (Emphasis in original)

d.   Graco agreed with, approved, and signed off on several editions of the CPS Technician Manual, beginning in 2004, where, in one or more editions, the following was stated:

i.   "*A tether . . . keeps the restraint from tipping forward on impact and can provide an extra margin of safety.*"

ii.   "*A tether connector can reduce the distance the child's head moves forward in a crash by 4 to 6 inches.  This lessens the risk of head injuries in a crash.*"

iii.   "*Best practice*" is the "*safest way to travel for (a) child*" and the "*gold standard of protection.*" "*Best Practice*" is to "*always use a tether if it is available for a forward-facing CR because less excursion means less risk of injury.*"

14

     iv.   "*A tether reduces the forward movement and rotation of the seat. The correct use of a top tether strap can improve the performance of any child restraint device for which a tether is recommended.*"

     v.   "*Can a tether cause neck injury? There have been no known instances of neck injury related to the use of a tether. In fact, the study cited in the question above showed that all measurements relating to potential neck injury were lower with a tether than without it . . . . Without a tether, there may be more potential of higher forces on the neck when the CR suddenly stops moving forward.*"

e.  Graco knew that, in dynamic testing of the 4Ever platform child restraint with a perfect installation, both head excursions and HIC (head injury criterion) were dramatically and substantially worse – riskier and more dangerous to a child – when a tether was not used. In fact, Graco knew that the 4Ever platform of child seats performed far worse in dynamic testing without the tether than many other earlier, older designs. In tests run before the subject crash, for example, one 4Ever seat when tested without the tether had over *12 inches* of additional head excursion over the tethered tests; another had a HIC score that was *205%* higher than testing run with a tethered seat.

f.  Graco knew in 2013, from a peer-reviewed scientific paper published by SAE and written by an expert witness it had used to defend it in dozens of child restraint lawsuits (William Van Arsdell) that "*tests with a harness CRS and a tether resulted in HIC values that were lower than those with a . . . harness CRS without a tether.*"

35.    What did Graco *not* know – what had it *not* done – prior to selling the subject child restraint that would have allowed it to assure and represent to Abbey and Aaron that, in their vehicle, using LATCH and the vehicle's seat belt were "*equally safe to use*" with a child restraint? Graco knew very little. For example, Graco:

   a.    Did *not* know how the 4EverDLX would perform in dynamic testing with the seat installed in the third row of any Ford Explorer using the Ford's seat belts, let alone a 2014 Ford Explorer – because it never ran any such dynamic tests. Had it done so, it would have learned that head contact when the 4EverDLX was installed in the 3rd row of the Ford with the Ford's seat belts (no tether) was likely.

   b.    Did *not* know – notwithstanding its actual knowledge of the absolute necessity of tether use "*in vehicles with small rear seating areas*" as set forth above – how much head clearance there was in the third row of the 2014 Ford Explorer. Why? Because it never made any attempt to measure it.  Had it done so, it would have known just how little room there was in the 3rd row seating position and, from testing conducted on the 4Ever platform without a tether, it would have known that even with perfect installation, and irrespective of a child's age, the seat would consistently allow for head contact if no tether was used.

### Facts Specific To Ford

36.    The Explorer was assembled by Ford in Illinois.

37.    The Explorer was a 5th generation Explorer (platform U502), sold from model year 2011 − 2016.

38.    Ford believes, understands, and knows that a "*child is by far the most precious cargo your vehicle will ever have to carry.*"

39.    Ford employee, engineer, and child safety proponent Paul Butler was, at all relevant times, a member of the SAE Restraint Systems Subcommittee, a member of the Blue Ribbon Panel on Child

Restraint and Vehicle Compatibility, was involved in child safety issues with Ford's approval, was instrumental in the development and review of the LATCH manuals discussed above, reported to Ford on his child safety related activities, and spoke on Ford's behalf regarding numerous and extensive child safety related activities. Because of Mr. Butler's job responsibilities and involvement in this work, as well as Ford's own design, engineering, and testing work on these subjects, Ford knew the critical importance of using tethers to secure forward-facing child restraints. Among other things, Ford knew:

a. All of the facts set forth in this complaint above and, for many of them, had actually reviewed, ratified, and approved them.

b. That beginning in around 1985, Ford recommended using child restraints that had tether straps because tethers provided "*added protection.*"

c. That L.W. Camp, its Director of Automotive Safety and Engineering Standards, Environmental and Safety Engineering had set forth Ford's official position on tethers as follows:

   i. In 1997: "*Because top tethers reduce head excursion in both frontal and lateral impacts, Ford believes that adoption of top tethers on all CRS and installation of anchors in all vehicles can substantially improve child safety.*"

   ii. In 1997: "*Ford supports installation of user-ready tether anchors.*"

   iii. In 1997: "*Ford supports prompt adoption of built-in tether anchors and straps, to provide child restraint performance similar to that now available in Canada and Australia.*"

   iv. In 1999: "*A tethered five-point harness restraint may provide the most effective real-world*

       *protection in vehicle seats with typical head-excursion space.*"

    v.   In 1999: "*Tethers will soon be installed on all new forward-facing harness restraints. All Ford products built in the last 15 years have tether anchorages, and new vehicles will soon have built-in tether anchors. Child restraint regulations should permit customers to make the best use of this safety equipment to protect their children . . . (and) use the restraint to its full capability.*"

    vi.   In 1999: "*Ford believes that (tether) anchors . . . would improve real-world child safety.*"

    vii.   In 1999: "*High mount tethers have been shown to improve real-world child safety . . . .*"

40.    Beginning around 1992, recognizing and understanding the critical importance of tethering child restraints as it had expressed above, Ford installed tether anchors in multiple seating positions in numerous multi-passenger vehicles containing three or more rows of occupant seats.

41.    For example, and for many years prior to the beginning of the production run of the 5th generation Explorer (late 2010), Ford installed a tether anchor for each of the three occupant positions in the third-row of the Econoline van. It installed a tether anchor for each of the three occupant positions in the third-row of the Ford Windstar. It installed a tether anchor for each of the three occupant positions in the third-row of the Mercury Villager.

42.    Another Ford vehicle with three rows of seats was the Ford Explorer. In 2002, Ford began selling the 3rd generation Explorer (platform U152) and the related Mercury Mountaineer. In the third-row seat of these vehicles, which were sold through model year 2005, both occupant positions had tether anchors for use with child restraints.

43.    Ford began selling the 4th generation Explorer (platform U251) and the related Mercury Mountaineer in 2006. In the third-row seat of these vehicles, which were sold through model year 2010, both occupant positions had tether anchors for use with child restraints.

44.    The 5th generation Explorer, with design work beginning around 2008, also had three rows of seats – with the third row primarily intended by Ford for use by children. A third-row that was a "small rear seating area." Notwithstanding decades of admissions regarding the necessity and efficacy of tethers, especially in vehicle seats with minimal space, as well as the fact that it had provided tether anchors for both occupant spaces in the third-row of the two prior generations of Explorer, Ford made the conscious business decision to remove one of these critical safety devices from the third-row of the 5th generation Explorer. Thus, Abbey's Explorer had only one tether anchor in the third-row – on the passenger side.

45.    Ford designed the 3rd row seat and outsourced its manufacturing to Lear. Had Ford asked, Lear could have easily and economically incorporated a tether anchor on the driver's side of the 5th generation Explorer. The skeletal frames of the two occupant seats in the 3rd row are mirror images of one another – the only apparent difference is that the driver's side lacks a tether anchor.

## Damages

46.    As a direct and proximate result of the events that occurred on November 9, 2021, A.R.M. was seriously injured.  Among other injuries, she suffered a head injury and a spinal cord injury that has left her a ventilator dependent quadriplegic. These injuries have resulted in the need for a multitude of hospitalizations, surgeries, and medical care, both in the past and in the future.  These injuries have resulted in, among other things, lost earnings, a diminished earning capacity, emotional distress, scarring, embarrassment, humiliation, depression, and constant pain and suffering. These injuries will require a significant amount of future medical care. In sum, as a result of the physical, mental and emotional injuries she suffered on

November 9, 2021, A.R.M. has sustained and will in the future sustain injuries and damages as follows:

a.    She has sustained and will in the future sustain severe, permanent and disabling injuries, including, but not limited to physical, psychological and emotional injuries;

b.    She has sustained and will in the future sustain constant physical pain and suffering and resultant mental anguish;

c.    She has sustained and will in the future sustain the loss of the capacity for the enjoyment of life;

d.    She will in the future lose substantial earnings and income, as well as the capacity to earn income; and

e.    She has incurred and will in the future incur expenses for hospitalization, medical and nursing care and treatment, in-patient and out-patient rehabilitation therapies, at home therapies, counseling, medical equipment and supplies, equipment and supplies needed to support A.R.M.'s disabilities, and other care-related expenses.

f.    At this time, past expenses incurred exceed $1,850,000.00 and plaintiffs are continuing to compile past expenses information. Future economic losses will be addressed and calculated by expert witnesses.

### Count I — Strict Liability Failure to Warn Against Graco

47.    Plaintiffs incorporate herein by reference paragraphs 1 through 46.

48.    Graco designed, manufactured, distributed, marketed, labeled, advertised, and sold the subject child restraint, with its instruction manual, in the course and scope of its business.

49.    At the time Graco sold the subject child restraint, as well as on November 9, 2021, the subject child restraint and its manual were in a defective condition, unreasonably dangerous when put to a reasonably anticipated use, and failed to provide users with adequate warnings of the dangers of the product, in the following respects:

a. The subject child restraint, its labeling, and its manual were not accompanied by sufficient warnings regarding

the risks of using the subject child restraint without a tether;

b. The subject child restraint, its labeling, and its manual did not inform the user of the actual or potential risks of harm not readily recognizable by an ordinary consumer while using it in a manner reasonably foreseeable by Graco, i.e., without a tether;

c. The subject child restraint, its labeling, and its manual did not inform the user that best practice was to always use a tether when installed forward-facing;

d. The subject child restraint, its labeling, and its manual did not inform the user that a tether contributes considerably to its effectiveness, when installed forward-facing, in frontal and side impacts;

e. The subject child restraint, its labeling, and its manual did not inform the user that using a tether improves protection for a child when using it forward-facing, is very beneficial, provides enhanced protection, improves safety, is vitally important, and is especially important for protection in a crash;

f. The subject child restraint, its labeling, and its manual did not inform the user that, in dynamic testing performed by Graco and others, the design of the child restraint allowed for excessive, unusual, atypical, and likely injurious head excursions and/or neck loads when installed without a tether;

g. The subject child restraint, its labeling, and its manual did not encourage, advise, or emphasize to users the necessity and importance of using a tether when installing it forward-facing. Instead, it told users, *incorrectly*, just the opposite – that installing it with LATCH (with a tether) and installing it with a three-point seat belt (without a tether) were "equally safe."

21

50.    Graco knew that the subject child restraint was or was likely to be dangerous when put to the use for which it was made, supplied, and sold.

51.    Graco knew or had reason to know that those for whose use the 4EverDLX was made, supplied, and sold, including Abbey and Aaron Morgan, would not realize the danger.

52.    The subject child restraint created a risk of harm beyond that which would be contemplated by the ordinary foreseeable user, including Abbey and Aaron Morgan.

53.    The defects outlined above rendered the subject child restraint unreasonably dangerous and unsafe for its intended use and were the proximate or a proximately contributing cause of the plaintiffs' injuries, damages and losses as set forth in paragraph 46 above.

WHEREFORE, plaintiffs pray for judgment against Graco, and jointly and severally against Ford, for a fair and reasonable sum of damages on Count I of their Complaint, for their costs, and for such other and further relief as the Court deems just and proper.

### Count II – Negligence Against Graco

54.    Plaintiffs incorporate herein by reference paragraphs 1 through 53.

55.    Graco designed, manufactured, distributed, marketed, labeled, advertised, and sold the subject child restraint, with its instruction manual, in the course and scope of its business.

56.    Graco owed duties to Abbey and Aaron and other consumers to use reasonable care to see that the subject child restraint, its labeling, and its manual, were designed, tested, manufactured, and sold in a condition that was safe for their use. These duties arise under the common law and the facts of this case.

57.    Graco failed to use reasonable care to see that the subject child restraint, its labeling, and its manual were safe for the use for which they were made.

58.    Graco's failure to use reasonable care to see that the subject child restraint, its labeling, and its manual were safe for the

use for which they were made was a proximate cause of some damage to the plaintiffs.

59.   Plaintiffs were damaged as set forth in paragraph 46 above.

WHEREFORE, plaintiffs pray for judgment against Graco, and jointly and severally against Ford, for a fair and reasonable sum of damages on Count II of their Complaint, for their costs, and for such other and further relief as the Court deems just and proper.

### Count III: Strict Liability Against Ford

60.   Plaintiffs incorporate herein by reference paragraphs 1 through 59 above.

61.    Ford designed, manufactured, assembled, distributed, marketed, labeled, advertised, and sold the subject Explorer in the course and scope of its business.

62.   At the time Ford sold the Explorer, as well as on November 9, 2021, the Explorer was in a defective condition, unreasonably dangerous when put to a reasonably anticipated use, in that the third-row seat of the Explorer lacked a tether anchor on the driver's side.

63.   Ford knew that the Explorer was or was likely to be dangerous when put to the use for which it was made, supplied, and sold.

64.   Ford knew or had reason to know that those for whose use the Explorer was made, supplied, and sold would not realize the danger.

65.   The Explorer created a risk of harm beyond that which would be contemplated by the ordinary foreseeable user.

66.   The defect set forth above rendered the Explorer unreasonably dangerous and unsafe for its intended use and was the proximate or a proximately contributing cause of the plaintiffs' injuries, damages, and losses as set forth in paragraph 46 above.

WHEREFORE, plaintiffs pray for judgment against Ford, and jointly and severally against Graco, for a fair and reasonable sum of

damages on Count III of their Complaint, for their costs, and for such other and further relief as the Court deems just and proper.

## Count IV: Negligence Against Ford

67.    Plaintiffs incorporate herein by reference paragraphs 1 through 66 above.

68.    Ford designed, manufactured, distributed, marketed, labeled, advertised, and sold the subject Explorer in the course and scope of its business.

69.    Ford owed duties to Abbey and Aaron and other consumers to use reasonable care to see that the Explorer was designed, tested, manufactured, and sold in a condition that was safe for its use. These duties arise under the common law and the facts of this case.

70.    Ford failed to use reasonable care to see that the Explorer was safe for the use for which it was made.

71.    Ford's failure to use reasonable care to see that the Explorer was safe for the use for which it was made was a proximate cause of some damage to the plaintiffs.

72.    Plaintiffs were damaged as set forth in paragraph 46 above.

WHEREFORE, plaintiffs pray for judgment against Ford, and jointly and severally against Graco, for a fair and reasonable sum of damages on Count IV of their Complaint, for their costs, and for such other and further relief as the Court deems just and proper.

## REQUEST FOR PLACE OF TRIAL

Pursuant to NECivR 40.1(b), plaintiffs respectfully request that the trial of this matter take place in Omaha, Nebraska.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial pursuant to Fed. R. Civ. P. 38(b).

Dated this 31st day of October, 2025.

Respectfully Submitted,

By:  *s/ Christopher P. Welsh*
Christopher P. Welsh
Nebraska Bar No. 22279
WELSH & WELSH, P.C., L.L.O.
9290 West Dodge Road, Suite 204
Omaha, NE 68114
Telephone: 402-384-8160
Fax: 402-500-3939
cwelsh@welsh-law.com

and

Randall L. Rhodes, *pending pro hac vice*
Kansas Bar No. 15811
Missouri Bar No. 43211
Rachel N. Boden, *pending pro hac vice*
Kansas Bar No. 26238
Missouri Bar No. 66109
Attorneys for Plaintiffs
ROUSE FRETS WHITE GOSS
GENTILE RHODES, P.C.
5250 West 116th Place, Suite 400
Leawood, KS 66211
Telephone: (913) 387-1600
Fax: (913) 928-6739
rrhodes@rousepc.com
rboden@rousepc.com

*ATTORNEY FOR PLAINTIFFS*